Re:     *UNITE HERE Int'l Union v. Pala Band of Mission Indians*
        Case No. 07-cv-2312

DECLARATION OF
KRISTIN L. MARTIN
IN SUPPORT OF OPPOSITION TO
MOTION TO DISMISS

## INDEX OF EXHIBITS

| Exhibit | Page(s) | Description |
|---|---|---|
| Exhibit A | 7-8 | Fax from Intertribal Court (November 1, 2007) |
| Exhibit B | 10 | Letter from Martin to Scott (w/o attachments) (March 10, 2008) |
| Exhibit C | 12-19 | Arbitration Award of Catherine Harris, Unite HERE v. Pauma Band of Mission Indians (April 30, 2006) |
| Exhibit D | 21-32 | Arbitration Award of Gerald McKay, Barona Band of Mission Indians and Hotel Employees and Restaurant Employees Int'l Union (February 4, 2003) |
| Exhibit E | 34-49 | Arbitration Award of Gerald McKay, Barona Band of Mission Indians and Hotel Employees and Restaurant Employees Int'l Union (December 2, 2003) |
| Exhibit F | 51-56 | Arbitration Award of Raul Ramirez, Hotel Employees and Restaurant Employees Int'l Union and Agua Caliente Band of Cahuilla Indians (March 3, 2004) |
| Exhibit G | 58-59 | Letter from Scott to Martin (without attachments) (February 22, 2008) |

# TAB A



# INTERTRIBAL COURT OF SOUTHERN CALIFORNIA

## OFFICE: 760-739-1470        FAX: 760-739-1472

## FAX COVER LETTER

**DATE:** *November 1, 2007*        **NUMBER OF PAGES:** *2*

**FAX NUMBER:** *415-597-7201*        **PHONE NUMBER:** *415-597-7200*

**TO:** *Kristin Martin*

**FROM:** *Lisa Powless, Tribal Court Admin Assistant*

**COMMENTS:** *1 fax cover sheet, 1 Tribal Intake Review Form*

Notice: This fax is intended only for the use of the addressee named herein and may contain legally privileged and confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax is strictly prohibited. If you have received this fax in error, please immediately notify us by telephone and return the original fax to us at the address below via the United States Postal Service. We will reimburse you for any cost you incur in notifying us and returning the fax to us. Thank You

### 365 W. 2nd Ave. Suite 215
### Escondido, CA 92025

Revised. 5/4/07eap

**Exhibit A**



# INTERTRIBAL COURT OF SOUTHERN CALIFORNIA

365 W. 2nd Ave. Suite 215
Escondido, CA 92025
**OFFICE: 760-739-1470**        **FAX: 760-739-1472**

## *Tribal Court Intake Review Form*

Date:_____

Name: _____

Address:_____

Phone:_____        Fax: _____

Tribal Affiliation/Membership: _____

➢ **Please State your Question /Issue Below. If more space is needed please attach another sheet of paper.**

➢ **Court Response**

➢ *The response provided herein is not meant to be a determination of your case or controversy nor is it a court order. For additional information regarding your matter please consult our attorney referral service or an Attorney of your choice.*

# TAB B

# DAVIS, COWELL & BOWE, LLP

Counselors and Attorneys at Law

**San Francisco**

595 Market Street, Suite 1400
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

Barry S. Jellison (CA)
Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
Elizabeth Ann Lawrence (CA, NV, AZ)
Andrew J. Kahn (CA, NV, AZ)
John J. Davis, Jr. (CA)
Florence E. Culp (CA, NV)
Michael T. Anderson (CA, NV, DC, MA)
Kristin L. Martin (CA, NV, HI)
Eric B. Myers (CA, NV)
Michael C. Hughes (CA)
Paul L. More (CA, NV)
Winifred Kao (CA, DC)
Sarah Varela (CA)

Robert P. Cowell (1931-1980)

of counsel:
Philip Paul Bowe (CA)
J. Thomas Bowen (CA, NV)
Mark Brooks (TN)

**Washington, DC**

1701 K Street, NW, Suite 210
Washington, DC 20006
202.223.2620
Fax 202.223.8651

George R. Murphy (DC)
Michael T. Anderson (DC, CA. MA, NV)
Mark Hanna (DC, VA, NJ, MI)
Artus J. Stephens (DC, MD, OH, PA)
Joni S. Jacobs (DC, CA, NV, AZ)
Keira M. McNett (DC, CA)

**Boston, MA**

8 Beacon Street, 4th Floor
Boston. Massachusetts 02108
617.227.5720
Fax 617.227.5767

Michael T. Anderson (CA, NV, DC, MA)

**Clifton, NJ**

1389 Broad Street
Clifton, NJ 07013
973.916.0999
Fax 973.916.0906

Mark Hanna (DC, VA, NJ, MI)

**McCracken, Stemerman
& Holsberry**

1630 S. Commerce Street. Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9848

March 10, 2008

Theodore R. Scott
Littler Mendelson
501 W. Broadway, Suite 900
San Diego, CA 92101-3577

     Re:    UNITE HERE and Pala Band of Mission Indians

Dear Mr. Scott:

Enclosed please find the proof of service that was filed in this case. Your client is in default. Please let me know if you would like an extension of time to answer the petition, or if you plan to answer at all.

I have now reviewed the documents that you sent to me by letter dated February 22, 2008. Please excuse the delay, as I was out of town. The records conflict in several important ways with what I was told by a representative of the Intertribal Court of Southern California. Are there any records, rules, or decisions of the Court that are available to the public? If so, please tell me what is available and where these documents are available. Also, please provide me a list of members of the bar of the Intertribal Court so that I may apply for membership.

Thank you for your attention.

Sincerely,

Kristin L. Martin

KLM/rs
Enclosure
unite5415

# Exhibit B

# TAB C

Exhibit C
Page 11

American Arbitration Association
*Dispute Resolution Services Worldwide*

*Western Case Management Center*
John M. Bishop
Vice President

Jeffrey Garcia
Assistant Vice President

6795 North Palm Ave, 2nd Floor, Fresno, CA 93704
telephone: 877-528-0880 facsimile: 559-490-1919
internet: http://www.adr.org/

June 14, 2006

## VIA FACSIMILE AND REGULAR MAIL

Kristin L. Martin, Esq.
Davis, Cowell & Bowe LLP
595 Market Street, Suite 1400
San Francisco, CA 94105

Mark Radoff, Esq.
California Indian Legal Services
609 S. Escondido Boulevard
Escondido, CA 92025

Re: 74 300 01199 05 LYMC
    UNITE HERE
    Union Access
    Persons employed & Eligible employess Dispute
    VS
    Casino Pauma

Grievances:    Union Access – Persons Employed and Elegible Employees Dispute

Dear Parties:

By direction of the Arbitrator, we herewith transmit to you the duly executed Award and Opinion on the threshold issue in this matter.

At this time we request that the parties notify the Association as to the need for an evidentiary hearing on the remaining issues.

Thank you for your cooperation.

Sincerely,
/s/
Lynn M. Cortinas - Case Manager
Direct: 559-490-1854 Fax: 559-490-1837
E-mail: cortinasl@adr.org

*Sandra L. Marshall- Supervisor: Direct: 559-490-1921/E-mail: marshalls@adr.org*

Enclosures

cc:    Jim Brown
       Catherine Harris, Esq.

Exhibit C
Page 12

# Exhibit C

Catherine Harris, Esq.
Arbitrator · Mediator
1950 South Land Park Dr. Suite 285
Sacramento, California 95822-3313
(916) 444-3317  Fax (916) 443-4655

IN ARBITRATION PROCEEDINGS

PURSUANT TO AGREEMENT OF THE PARTIES

| | |
|---|---|
| In the matter of a controversy between ) | |
| ) | |
| UNITE HERE, ) | |
|                Union, ) | |
| ) | **OPINION AND AWARD** |
| and ) | *Case No. 74 300 01199 05* |
| ) | |
| PAUMA BAND OF MISSION INDIANS, ) | |
| ) | |
|                Tribe, ) | |
| ) | |
| Involving Union Access. ) | |

This matter came before Catherine Harris, Esq., a member of the Tribal Gaming Panel, who was mutually selected by the parties to render a final and binding decision pursuant to Section 13 ( c ) of the Tribal Labor Relations Regulation (herein "the TLRR").

Kristin L. Martin, Esq., Davis, Cowell & Bowe, LLP, appeared on behalf of UNITE HERE (herein "the Union").

PAUMA BAND OF MISSION INDIANS (herein "the Tribe") was represented by Mark A. Radoff, Esq., California Indian Legal Services.

### PROCEDURAL HISTORY

By Notice of Hearing dated February 6, 2006, this case was set for hearing on May 12, 2006.    On March 27, 2006, a Stipulation signed by both parties was received by the arbitrator which generally provides that, in lieu of an evidentiary hearing on May 12, 2006, the hearing will be bifurcated in order that the initial issue may be determined by the arbitrator based on stipulated facts and the parties' written arguments. The parties further

1

Exhibit C
Page 13

1

2  stipulated that after the initial issue is decided by the arbitrator, either party may request an

3  evidentiary hearing to decide any remaining issues.

4      On March 27, 2006, the arbitrator, based on the parties' stipulation, agreed to decide

5  the threshold issue without a hearing as long as the parties limited their arguments to

6  stipulated facts and the arbitrator determined that there was a sufficient record upon which to

7
   base her preliminary decision.  Having examined the stipulation and the briefs of the parties,
8
9  the arbitrator will decide the following jointly submitted issue:

10      Do the substantive provisions of the Tribal Labor Relations Regulation (herein "the
        TLRR") apply to the Casino Pauma and any related facilities because there are more
11      than two hundred and fifty (250) employees, including both "Eligible Employees" and
        other non-Eligible Employees, employed in the Casino Pauma and any related
12      facilities; or are those substantive provisions inapplicable if there are less than 250
13      "Eligible Employees"?

14  Pursuant to their stipulation, the parties agree that the TLRR was adopted by the Tribe in

15  accordance with Section 1 of the TLRR and that the Casino Pauma is a "tribal casino" within

16  the meaning of Section 1 (a) of the TLRR. The parties further agree that the determination of

17
   the threshold issue in this case is governed by the language of the following TLRR
18
19  provisions.

20              **RELEVANT PROVISIONS OF THE TLRR**

21  I.   Threshold of Applicability

22
   (a) Any tribe with 250 or more persons employed in a tribal casino and related facility shall
23  adopt this Tribal Labor Relations Regulation (TLRR or Regulation). For purposes of this
   Regulation, a "tribal casino" is one in which class III gaming is conducted pursuant to a
24  tribal-state compact. A "related facility" is one for which the only significant purpose is to
25  facilitate patronage of the class III gaming operations.

26  (b) Any tribe which does not operate such a tribal casino as of September 10, 1999, but
   which subsequently opens a tribal casino, may delay adoption of this regulation until one year
27

28              2
            Exhibit C
            Page 14

Catherine Harris, Esq.
Arbitrator - Mediator
5960 South Land Park Dr., Suite 255
Sacramento, California 95822-3313
(916)444-3317  Fax(916)443-4635

Catherine Harris, Esq.
Arbitrator • Mediator
5960 South Land Park Dr., Suite 255
Sacramento, California 95822-3313
(916)444-3317  Fax(916)443-4635

from the date the number of the employees in the tribal casino or related facility as defined in 1 (a) above exceeds 250.

(c) Upon the request of a labor union, the Tribal Gaming Commission shall certify the number of employees in a tribal casino or other related facility as defined in 1 (a) above. Either party may dispute the certification of the Tribal Gaming Commission to the Tribal Labor Panel.

II.    Definition of Eligible Employees

(a) The provisions of this regulation shall apply to any person (hereinafter "Eligible Employee") who is employed within a tribal casino in which Class III gaming is conducted pursuant to a tribal-state compact or other related facility, the only significant purpose of which is to facilitate patronage of the Class III gaming operations, except for any of the following:

(1) Any employee who is a supervisor, defined as any individual having authority, in the interest of the tribe and/or employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment;

(2) Any employee of the Tribal Gaming Commission;

(3) Any employee of the security or surveillance department, other than those who are responsible for the technical repair and maintenance of equipment;

(4) Any cash operations employee who is a "cage" employee or money counter; or

(5) Any dealer.

In accordance with paragraph (6) of the parties' stipulation, it is undisputed that there are

more than two hundred fifty (250) employees employed in the Casino Pauma and any related

facilities.  The parties disagree as to whether there are more than two hundred and fifty (250)

"Eligible Employees" employed in the Casino Pauma and any related facilities.

## POSITION OF THE UNION

The plain language of the TLRR supports the Union's position.  Section I (A) is the

Exhibit C
Page 15

1

2    only provision of the TLRR which refers to the number of persons employed in a tribal casino

3    or related facility Thus, the question of whether or not 250 or more persons are employed in a

4    tribal casino or related facility is relevant only to the Tribe's obligation to adopt the TLRR.

5    Once the TLRR has been adopted, its substantive provisions apply to specified employees of a

6    tribal casino or related facility who are referred to as "Eligible Employees." Section II (A)

7
     explicitly states: "The provision of this regulation shall apply to any person who ...[meets the

8
     definition of an "Eligible Employee"]."

9

10       The Tribe's position is not supported by the TLRR's plain language. If, as the Tribe

11   contends, the parties had intended that there must be 250 "Eligible Employees" before the

12   substantive provisions of the TLRR are applied, they would have simply required 250

13   "Eligible Employees" as a precondition to *adoption* of the TLRR. Moreover, the Union's

14   position is consistent with federal employment statutes which make application of a statute

15   contingent on the number of employees employed by a particular employer, but grant only

16
     some employees substantive rights under that statute.

17

18       For all of these reasons, the Union takes the position that it is entitled to access under

19   Section 8. The Union requests that the arbitrator issue an award declaring that the TLRR's

20   substantive provisions apply to the Casino Pauma and any related facilities because there are

21
     more than 250 employees employed in the Casino Pauma and any related facility.

22

23                            **POSITION OF THE TRIBE**

24       The TLRR defines the "Threshold of Applicability" of the regulation and makes an

25   important distinction. The *adoption* of the regulation (which did in fact occur here) was

26   triggered by the Tribe employing 250 or more persons in a tribal casino. However, the

27

28

Catherine Harris, Esq.
Arbitrator · Mediator
9980 South Land Park Dr., Suite 255
Sacramento, California 95822-3313
(916)441-3317   Fax(916)443-4635

Catherine Harris, Esq.
Arbitrator • Mediator
5369 South Land Park Dr., Suite 255
Sacramento, California 95822-3313
(916)443-3317 Fax(916)443-4633

1

2  regulation distinguishes between total employees and "Eligible Employees." Section II of the

3  TLRR unambiguously limits the *applicability* of the provisions of the regulation to "Eligible

4  Employees."

5      In order to calculate how many "Eligible Employees" work at the casino, those listed

6
7  in Section II (A) of the TLRR (supervisors, Tribal Gaming Commission employees, certain

8  security or surveillance department employees, cage employees or money counters, and

9  dealers) must be subtracted from the total employee calculation. This is important because

10  access to the Casino is triggered by the number of "Eligible Employees."[1]

11      The regulation is clear: "persons employed" is the definition used to trigger adoption

12  of the TLRR, but application is based on the number of "Eligible Employees." There is no

13  need to resort to any type of extrinsic evidence to determine legislative intent where the

14  words of the section are clear.[Citation]. Section II specifically provides that "[T]he

15  provisions of this regulation shall apply to any person (hereinafter "Eligible Employee") who

16

17  is employed within a tribal casino in which Class III gaming is conducted. ..." Thus, the Union

18  cannot use the initial 250 employee count, which only requires adoption of the regulation, as

19  a basis for union access. [2]

20

21  ///

22

23      [1] In this connection, Section VIII (A) [Access to Eligible Employees] provides: "Access shall
be granted to the union *for the purposes of organizing Eligible Employees*, provided that such
24  organizing activity shall not interfere with patronage of the casino or related facility or with the normal
work routine of the Eligible Employees and shall be done on non-work time in non-work areas that are
25  designated as employee break rooms or locker rooms that are not open to the public (Emphasis
supplied)."

26
27      [2] Although both parties have referenced the arabic numerals contained in the Tribal Labor
Relations Ordinance, the arbitrator has used the roman numerals contained in the TLLR.

28

Catherine Harris, Esq.
Arbitrator • Mediator
5969 South Land Park Dr., Suite 255
Sacramento, California 95822-3313
(916)444-3317  Fax(916)443-4635

**OPINION**

In the instant case, both parties claim that the language of the TLRR unequivocally supports its position. Thus, the parties have agreed to submit the dispute concerning the interpretation of the TLRR to the arbitrator based solely on the Stipulation, the text of the regulation, and the parties' written arguments. No extrinsic evidence pertaining to legislative intent has been presented by either party. For reasons explained herein, the arbitrator is persuaded that the Union's interpretation is supported by the plain meaning of the disputed language.

While the Tribe argues that a different standard applies to "adoption" than to "application" of the regulation, the arbitrator finds no support in the TLRR for this interpretation. Unlike Section II, Section I carries the heading "Threshold of Applicability" whereas Section II is labeled "Definition of Eligible Employees." There is no indication in Section II that a new and different "threshold of applicability" has been established. Rather, Section II merely describes which category of employees will receive the benefits (rights to form and join unions and bargain collectively as contained in Section IV) and protections (afforded by the unfair labor practice provisions of Section V) of the TLRR once it has been adopted.

Consistent with this interpretation, the arbitrator finds no support for the Tribe's contention that the TLRR requires a second threshold of 250 "Eligible Employees" as a condition precedent to the exercise of rights conferred by Section 8. Had the authors of the regulation intended to further limit the application of substantive provisions to casinos and related facilities with 250 "Eligible Employees" (and not just 250 total employees), they

Catherine Harris, Esq.
Arbitrator • Mediator
9960 South Land Park Dr., Suite 255
Sacramento, California 95822-3313
(916)444-3317  Fax(916)443-4635

1
2   would have so provided.  Based on the clear and unambiguous language of the regulation,
3   the arbitrator must conclude that the Tribe's position is not supported by the TLRR's plain
4   language.
5           In sum, the Tribe has not provided a plausible interpretation of the disputed language.
6   In the arbitrator's view, reading Sections I and II in tandem, the only plausible interpretation
7
8   is that the overall employee complement of 250 triggered adoption of the TLRR in
9   accordance with Section I. Once the TLRR was adopted by the Tribe, the substantive
10  provisions of the ordinance became applicable to "Eligible Employees" as defined in Section
11  II. The interpretation being urged by the Tribe in the instant case would require the arbitrator
12  to read something into the TLRR which is not contained within the four corners of the
13  regulation.
14
15          Based on the foregoing findings and conclusions, the following award is made:
16                                    **AWARD**
17          The substantive provisions of the TLRR apply to the Casino Pauma and any related
18  facilities because there are more than two hundred and fifty (250) employees, including both
19  "Eligible Employees" and other non-Eligible Employees, employed in the Casino Pauma and
20  any related facilities.
21
22  Dated: June 12, 2006
23
24                                    **CATHERINE HARRIS, Arbitrator**
25
26
27
28                                        **7**

Exhibit C
Page 19

# TAB D

## A MATTER IN ARBITRATION

| | |
|---|---|
| In a Matter Between: ) | Grievance:    The Access Arbitration |
| ) | |
| BARONA BAND OF MISSION INDIANS ) | |
| ) | |
| (Employer) ) | |
| ) | Hearing:    January 12, 2004 |
| and ) | |
| ) | Award:    February 3, 2004 |
| HOTEL EMPLOYEES AND ) | |
| RESTAURANT EMPLOYEES ) | McKay Case No.    03-182(A) |
| INTERNATIONAL UNION ) | |
| ) | AAA No.    74 390 178 03 CRMA |
| (Union) ) | |
| ) | |

### DECISION AND AWARD

### GERALD R. McKAY, ARBITRATOR

Appearances By:

Employer:    Art Bunce, Esq.
             Law Offices of Art Bunce
             P. O. Box 1416
             Escondido, CA 92033

Union:    Richard G. McCracken, Esq.
          Davis, Cowell & Bowe
          595 Market Street, Suite 1400
          San Francisco, CA 94105

**Exhibit D**

2425

## A MATTER IN ARBITRATION

| | | |
|---|---|---|
| In a Matter Between: ) | Grievance: | The Access Arbitration |
| BARONA BAND OF MISSION INDIANS ) | | |
| (Employer) ) | Hearing: | January 12, 2004 |
| and ) | Award: | February 3, 2004 |
| HOTEL EMPLOYEES AND ) | | |
| RESTAURANT EMPLOYEES ) | McKay Case No. | 03-182(A) |
| INTERNATIONAL UNION ) | | |
| (Union) ) | AAA No. | 74 390 178 03 CRMA |

## STATEMENT OF PROCEDURE

This matter arises out of a Tribal Labor Relations Ordinance (TLRO) established as a result of a Tribal State Gaming Compact between the Tribe and the State of California. Pursuant to the Ordinance, disputes between Unions seeking representation of employees working for the Tribe's Casino and the Tribe are to be submitted to binding arbitration. Pursuant to the terms of that Ordinance and the Compact between the Tribe and the State of California, the Union filed a request for arbitration over the Tribe's refusal to grant the Union access for purposes of organizing in a manner which conforms to the State Compact. Initially, a hearing was held in November 2003, and a decision was rendered on December 2, 2003 addressing certain procedural questions regarding the scope of issue before the Arbitrator. The Arbitrator determined that the issue before him was the Union's right to access, not simply the granting of a vendor's license by the Tribe. As a result of that decision, a second hearing was held to address the issue of access on January 12, 2004 in San Diego, California. As part of the hearing, the

Exhibit D
Page 22

Arbitrator and the parties visited the Casino to physically observe the various locations where employees break and where the Union would have access pursuant to the terms of the Ordinance and the State Compact. Subsequent to the close of the hearing, the parties filed written briefs, which the Arbitrator received on or before January 23, 2004. Having had an opportunity to review the record, the Arbitrator is prepared to issue his decision.

## ISSUE

What access rights does the Union have at the Tribe's Casino pursuant to the Tribal Ordinance and the State Compact?

## BACKGROUND

The Union has been attempting to obtain access to the Tribe's Casino for purposes of organizing since July 29, 1999. In the decision issued by this Arbitrator on December 2, 2003, the Arbitrator concluded that the Tribe deliberately delayed the process of granting a license to the Union in an effort to thwart its efforts at organizing employees in the Casino. The Arbitrator also informed the parties in the decision that any issue concerning access needed to be raised by the Tribe at the hearing to be scheduled subsequent to that decision. Any access issue not raised would be considered to have been waived. At the hearing conducted on January 12, 2004, the only issue raised by the Tribal representatives focused on limiting the Union Organizers to a table at the various break areas where employees gather for breaks and dining. It was the position of the Tribe that limiting the Union Organizers to fixed locations within those various break areas was appropriate access and minimized the interference the Organizers would cause with the operation of those break facilities. In the main employee dining room, the Tribe had

designated a table area near the entrance for the use of the Organizers and precluded the Organizers from access to any other part of the cafeteria. It is the position of the Union that access to employee break areas means precisely what it says. There are no restrictions on that access, such as those being attempted to be imposed by the Tribe. The Union wishes to have access to the employee break areas without interference or restrictions, so long as the Organizers do not interfere with the operation of the employees who are working in the cafeteria and other break areas while those employees are on duty.

Ms. Jennifer Skurnik, a District Organizer for the Union, testified that she has been involved in organizing efforts at a number of facilities in Las Vegas, Nevada and in California. She identified three California Indian Casinos where she has assisted in organizing. Those were Palm Springs, Woodland, and Cache Creek. In the Cache Creek facility, Ms. Skurnik stated, the Union had access to the dining room, break rooms, the time clocks, and the hallways in its effort to organize employees. There were no restrictions placed on the Organizers that required them to remain at one location, such as a table, in any of those portions of the Casino just identified. Ms. Skurnik stated that the Organizers had free access to circulate among the tables in the dining area. Ms. Skurnik testified that it was her experience in all of the organizing efforts in which she has been involved where the Union has been granted access to particular areas that those employers have not placed any restrictions on the Organizers, such as the restrictions proposed by the Tribe in the present dispute.

Ivana Krajcinovic testified that she works as a Lead Organizer for the Union and is the Director of Organizing in Sacramento. It was her experience in the organizing efforts that she has conducted where access had been granted to Union Representatives that there are no restrictions placed on the movement of Organizers within those permitted locations. She testified that the Employer's desire to limit the Organizers at this Casino to a specific table in the

dining room creates a problem for the Union for a number of reasons. First, employees are concerned that the Employer will retaliate against them if the Employer sees the employees talking to the Union at the Union table. Second, employees have a limited amount of time to eat their meal. Normally, employees have 30 minutes. This is not enough time to allow them to eat their meal and also visit the Union at a Union table. Finally, many of the workers are Spanish-speaking individuals who are not aware that the Union Organizers can speak Spanish. If the Organizers circulate among the tables speaking Spanish, the employees then realize that they can communicate with the Organizers.

Leslie Recard, the Assistant Manager of the Employee Cafeteria, and Charles Bahr, a consultant for the Employer on matters of human resources, testified that the Employer has a no-solicitation policy, which was adopted by the Tribal Council. This policy would preclude solicitation such as those made by Union Organizers. However, both individuals indicated that the Tribal Council was willing to permit an exception to be made to the no-solicitation rule so long as the Organizers confined their efforts to a specific location in the cafeteria and break areas. Mr. Bahr acknowledged on cross-examination that the no-solicitation rule cannot supercede the Compact that the Tribe has with the State for operating the Casino. If the State Compact requires access, Mr. Bahr acknowledged, then that would take precedence over the Tribal Ordinance restricting solicitation.

## POSITION OF THE PARTIES

### TRIBAL POSITION

The Tribe stated that it offered to provide two tables to the Union Organizers, plus other additional adjacent tables for use by the two licensed representatives if the actual volume of business required additional tables. The Tribe stated that it is willing to allow the Organizers to

Re: Access Arbitration                                                                    Page 6

choose some other table location if the Organizers find the location selected by the Employer to be unacceptable. The Tribe stated that it is willing to designate a table in the outside smoking area by the cafeteria and in the Backstage Café, as well as the smoking area adjacent to that facility for the Organizers as well. In short, the Tribe stated that it offered to designate whatever small reasonable number of tables that business justifies that are available and that the Union chooses in the four employee break areas.

The reason why the Tribe wishes the Union Representatives to be seated at previously designated and appropriately signed tables rather than roving about and seating themselves at whatever tables where they see employees already located is that the Tribe wishes to protect unwilling listeners from being assailed and harassed by unwanted solicitations. There are only these four employees break areas. Employees have nowhere else to go on breaks or to eat meals. Under Section 4 of the Tribal Labor Ordinance, eligible employees have two kinds of rights. They have the right to self-organization and they have the right to refrain from such activities. Ms. Recard and Mr. Bahr testified that the Tribe's no solicitation policy is in place and furthers the goal of not taking up the limited free time of employees or making them feel uncomfortable at being asked to join, contribute to, or otherwise participate in organizations or activities that have no connection to their employment.

The Tribe's across-the-board policy of protecting the unwilling listeners from any solicitation is also consistent with the U.S. Supreme Court's approach to the unwilling listener problem in the First Amendment area. The eligible employees are a captive audience in that they have nowhere else to eat or take their breaks other than the four break areas. The so-called

intimidation factor from the security cameras is a false issue. The concern the Union has that

employees will be retaliated against for talking to Organizers also has no basis in factual support.

The presence of Union Organizers roving around may in fact create a chill on those employees

who do not wish to be associated with the Union. The TLRO does not address exactly what kind

of access the Tribe must provide within the four break areas. Since it is the eligible employees

who have the right to self-organization under Section 4 of the TLRO, or the equal and

affirmative right not to do so, this is a reasonable accommodation to limit the Organizers to a

specific table. For these reasons the Barona Band of Mission Indians urged the Arbitrator find

that no violation of Section 8(a) has occurred.

### UNION

The Union quoted from Section 8(a) of the TLRO which states in part:

"Access shall be granted to the union for purposes of organizing Eligible
Employees, provided that such organizing activity shall not interfere with
patronage of the casino or related facility or with the normal work routine of the
Eligible Employees and shall be done on non-work time in no-work areas that are
designated as employee break rooms or locker rooms that are not open to the
public. . . ."

The Union stated this section limits access to the break areas and locker rooms, but does not

further specify any particular locations in those areas or give any power to the Tribe to impose

limitations on the location or movement or Organizers. The plain meaning of Section 8 does not

allow the Tribe to limit the locations within the break areas where the Union Organizers may

make contact with Casino workers. The Union pointed out that Mr. Bahr, the Employer's expert

witness, testified that the no-solicitation rule does not take precedent over the compact between

the Tribe and the State. The Tribe, during the course of the hearing, the Union stated, did not

offer any business reasons for confining the Union Representatives to a particular spot in the
employee dining room. The Union's witnesses testified that in their experience that other similar
facilities where access is granted, access is not restricted in the manner that the Tribe is presently
attempting to restrict access. There were no contradictory witnesses presented by the Tribe to
the testimony of the Union's witnesses.

The Union explained why the reserved table creates a problem for it in organizing.
Among other things, approaching the Union table would be in full view and most obvious to
everyone, including management. This could create a chilling effect on those employees
interested in obtaining information about the Union. The short lunch and break time of the
employees also creates a problem for those employees to approach the Union table rather than
the Organizers approaching the employees as they eat. Finally, many of the employees speak
Spanish and might be reluctant to approach the table not knowing whether the Organizers there
spoke Spanish or not. If the Organizers approach the employees speaking Spanish, there would
not be this reluctance. For all these reasons, the Union stated, the Arbitrator should rule that the
Union Organizers have unrestricted access to the employee break areas, including the EDR, the
Backstage Café, and the outside smoking and eating areas adjacent to those facilities.

## DISCUSSION

As a result of a Compact the Tribe made with the State, it agreed to allow the Union
access for purposes of organizing. In compliance with this, it passed Section 8(a) of the TLRO
to extend this access right to the Union. What the Tribe wishes to do now is to limit that access
to specific areas within employee break facilities rather than to allow access to the break

facilities as stated in the Ordinance. The only limitations placed on the Organizers is that they are not to interfere with the normal work routine of eligible employees or interfere with the patronage of the Casino by the terms of the TLRO. The Tribe asserts, however, that it needs the limitation to be consistent with its no-solicitation rule that is designed to protect the employees during the employees' free time.

The right of the Union to have access is an extremely important right and one which resulted from negotiations between the Tribe and the State and other interested groups. In the absence of such an agreement in a traditional setting, the Union would not have access to the facility of the Employer during the organizing effort. These same access provisions were negotiated by other Tribal groups in California, all resulting in the same type of general access language. In the examples provided by the Union witnesses of these other casinos that the Union is attempting to organize or has organized, all of them provided access in the way the Union has described. Not one of them has restricted the Union Organizers to a particular table or a specific location within one of the areas for which access must be granted. To equate the organizing by the Union and the employees who work in the Casino with general solicitations and the need for limitation on general solicitations misses the significance of the process in which the employees and the Union are engaged.

The Employer approaches the efforts by the Union as if it was an outside vendor selling hamburgers or wieners to the employees who work for the Casino. What the Union is doing is providing assistance to the employees so that the employees can organize themselves into a collective bargaining unit in order to negotiate with the Employer over their wages, hours, and working conditions. The Union is not an outside vendor selling commodities. It is a service organization assisting the employees who work for the Employer to exercise the rights the employees have. For this reason, it is inappropriate to equate the Union Organizers with

individuals soliciting employees to contribute to the Boy Scouts or buy cookies. The efforts of
the Organizers and the efforts of the employees who work for the Employer is to establish
representation which will become an integral part of the Employer's business; not something
separate and apart and unrelated to the Employer's business.

        The Employer failed, through the testimony of it witnesses, to establish any clearly
identifiable business reason for limiting the Union Organizers to a particular table. In its
argument, the Tribe asserted that allowing the Organizers to circulate through the cafeteria would
interfere with the rights of those employees who did not want to be approached by the Union
Organizers. Certainly, an employee has a right to tell the Union Organizers they are not
interested in talking. If Organizers persist in harassing employees who do not wish to talk to
Union Organizers then the Tribe would have a complaint that should be addressed. In the
absence of any evidence that employees are being harassed in a manner that is inappropriate, the
Tribe's reasons for limiting the Organizers to a single table is purely speculative. It is highly
unlikely, in the Arbitrator's opinion that Organizers will engage in conduct that harasses and
irritates employees. The Union is concerned with obtaining support from its constituent
members and not in alienating those members. So far as the Arbitrator is able to determine, there
were no other business related reasons that would require the Tribe to limit the Organizers'
solicitations to a particular table. The Organizers are prohibited from interfering with the patrons
of the Casino and are prohibited from interfering with the employees' work routines. Aside from
those restrictions, there are no other restrictions that would prohibit Organizers from approaching
employees in non-public areas to inquire about an employee's interest in participating in
collective bargaining. In the absence of any clear business related reason for limiting the
Organizers, there is nothing in the TLRO that would permit the Tribe to tell the Organizers that
they must stay at a particular table with a large sign on it identifying them as Union Organizers.

Re: Access Arbitration                                                    Page 11

        The Union presented a number of very substantial reasons why limiting Organizers in

that fashion is prejudicial both to the rights of the Union and to the rights of the employees who

wish to find out about the Union. Employees may be concerned that the Employer will retaliate

against them for showing interest in the Union. The Employer has made it clear in the literature

that was presented at the arbitration hearing by the Union that it is not interested in having a

Union represent the employees who work for it. Employees, based on what they read, would

logically conclude that the Employer would not be happy if the employee showed an interest in

establishing a collective bargaining relationship with the Employer. The Union also noted that

the employees eat lunch in the 30 minutes they have in the break area and need the time to eat

lunch. The Organizers, without interfering with the employees eating lunch, can better use the

time of the worker to sit with the employees and talk as they eat. Finally, the Union pointed out

that many of the employees speak Spanish and may not approach the table on the basis they

would not realize the Organizers spoke Spanish. Organizers approaching these employees on

other hand speaking Spanish would provide those employees with information that if they were

interested in the Union; they could speak to the Organizers in Spanish. The concerns expressed

by the Union far outweigh any of the concerns expressed by the Tribe for restricting the

Organizers to a table.

        In summary, the provisions of Section 8(a), which allow the Union access to the non-

work areas at the Casino, do not restrict the Organizers to a specific location within those areas.

In the four areas identified during the arbitration hearing, the Union Organizers may go to those

areas and move about in those areas as the Organizers determine most appropriate.    The

Organizers are admonished that they are not permitted to interfere with any of the workers who

are working for the Employer at those locations. The Organizers are not permitted to interfere

with any patrons of the Casino. The Organizers are permitted to approach and talk to employees

Re: Access Arbitration                                                           Page 12

in those four locations who are off duty, eating lunch, or on a break. To the extent that the Tribe

attempts to restrict the Union to a specific table, it violates the provisions of Section 8(a) of the

TLRO and the Compact, which it made with the State of California. The reference to access in

the language means general access to the area, not area to a specific location within an area. The

Tribe is, therefore, directed to permit the Organizers for HERE to have access to the four

locations, including the cafeteria called the EDR, and the Backstage Café, as well as the two

outside smoking and eating areas associated and adjacent to those two facilities. The Tribe is

directed to remove the large sign in the EDR identifying tables as the location for HERE

Organizers.

## AWARD

The Tribe's effort to limit the Organizers of HERE to a specific table in the employee

break areas is a violation of Section 8(a) of the TLRO. Access as used in that provision of the

ordinance means that the Union has general access to the area. It is not limited to access to a

specific location within those areas. The Tribe is directed to immediately allow the Union

Organizers access to the four areas in the Casino where employees take breaks and eat lunch.

That access is to be unrestricted and unidentified in the sense that there is not to be a table with a

large sign identifying it as the location for the HERE Organizers. Those signs are to be removed.

**IT IS SO ORDERED.**

Dated: February 4, 2003

                                                   Gerald R. McKay, Arbitrator

# TAB E

.

# A MATTER IN ARBITRATION

| | |
|---|---|
| In a Matter Between: | |
| BARONA BAND OF MISSION INDIANS | Grievance:   The Access Arbitration |
| (Employer) | |
| and | Hearing:   November 6, 2003 |
| HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION | Award:   December 2, 2003 |
| | McKay Case No.   03-182 |
| (Union) | AAA No.   74 390 178 03 CRMA |

## DECISION AND AWARD

## GERALD R. McKAY, ARBITRATOR

Appearances By:

Employer:      Art Bunce, Esq.
               Law Offices of Art Bunce
               P. O. Box 1416
               Escondido, CA 92033

Union:         Richard G. McCracken, Esq.
               Davis, Cowell & Bowe
               595 Market Street, Suite 1400
               San Francisco, CA 94105

**Exhibit E**

2454

# A MATTER IN ARBITRATION

| | |
|---|---|
| In a Matter Between: | Grievance:    The Access Arbitration |
| BARONA BAND OF MISSION INDIANS | |
| (Employer) | Hearing:    November 6, 2003 |
| and | Award:    December 2, 2003 |
| HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION | McKay Case No.    03-182 |
| (Union) | AAA No.    74 390 178 03 CRMA |

## STATEMENT OF PROCEDURE

This matter arises out of a Tribal Labor Relations Ordinance established as a result of a Tribal State Gaming Compact between the Tribe and the State of California. Pursuant to the Ordinance, disputes between Unions seeking representation of employees working for the Tribe's Casino and the Tribe are to be submitted to binding arbitration. Pursuant to Section 13 of the Tribal Ordinance, the Union appealed a decision made by the Tribal Council relative to the Union's claim that the Tribe was denying access to the facility for purposes of organizing, as required by the law. A hearing on the issue was held in San Diego, California on November 6, 2003. During the course of the proceedings, the parties had an opportunity to present evidence and to cross-examine the witnesses. At the conclusion of the hearing, the parties agreed to file letter briefs in support of their respective positions. The Arbitrator received those letter briefs on or before November 10, 2003. Having had an opportunity to review the record, the Arbitrator is prepared to issue his decision.

Re: The Access Arbitration                                                    Page 3

## ISSUE

Did the Barona Band of Mission Indians violate Section 8(a) of the Tribal Labor Relations Ordinance (TLRO) with regard to granting access to the Union for purposes of organizing? If so, what is the appropriate remedy?[1]

## RELEVANT TLRO LANGUAGE

Section 8:  Access to Eligible Employees

(a)     Access shall be granted to the union for the purposes of organizing Eligible Employees, provided that such organizing activity shall not interfere with patronage of the casino or related facility or with the normal work routine of the Eligible Employees and shall be done on non-work time in non-work areas that are designated as employee break rooms or locker rooms that are not open to the public. The tribe may require the union and or union organizers to be subject to the same licensing rules applied to individuals or entities with similar levels of access to the casino or related facility, provided that such licensing shall not be unreasonable, discriminatory, or designed to impede access.

(b)     The Tribe, in its discretion, may also designate additional voluntary access to the Union in such areas as employee parking lots and non-Casino facilities located on tribal lands.

## BACKGROUND

On July 29, 1999, the Union sent the Tribe a letter expressing its interest in obtaining access to employees working at the Tribe's Casino in response to a decision made by the Tribe to afford access rights to the reservation to unions.[2] The Tribe responded in a letter dated August 3, 1999 informing the Union that it had to obtain a license from the Gaming Commission to

---

[1] The parties did not agree on a statement of the issue. Based on the evidence presented, it is the Arbitrator's opinion that the issue he has framed reflects the nature of the controversy.
[2] Union Exhibit #2

establish that it was a suitable organization to associate with the gaming enterprise. The Union
was informed that the standard that they must meet was Section 10(b)(2)(F)(ii)(II) of the Indian
Gaming Regulatory Act of October 13, 1988. The language quoted stated:

> "Any person whose prior activities, criminal record, if any, or reputation, habits,
> and associations pose a threat to the public interest or to the effective regulation of
> gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices
> or methods and activities in the conduct of gaming shall not be eligible for
> employment [or licensing]."

The Union was sent standard forms and materials, which the Gaming Commission provided to
all prospective vendors seeking licensing. The Union was informed:

> "The Tribal Government looks forward to a positive working relationship with
> HERE, a relationship which respects both Trial sovereignty and the need of
> employees for complete information, both positive and negative, in an atmosphere
> that is free of intimidation and coercion."[3]

The Union submitted its application, along with a check in the amount of $1,000, in
January 2000.[4] Between January and September 2000, the Union and the Tribe communicated
concerning the application with the Gaming Commission and the Tribe asserting that the Union
had failed to submit all of the necessary parts of the application. In April 2001, the Union
submitted a revised application for licensing.[5] It submitted a check on August 31, 2001 in the
amount of $625.00 to cover the licensing fees for five employees. In October, the Tribe and
Gaming Commission requested personal identification for a number of individuals, including
Danna Schneider, Jennifer Skurink, and Maricruz Garcia. The Union complied with that request

---

[3] Union Exhibit #3
[4] Union Exhibit #6
[5] Union Exhibit #8

Re: The Access Arbitration                                                    Page 5

in November 2001.[6] The Tribe then requested social security cards from the Union's applicants

in December 2001 and the Union complied with that request in January 2002.

The Union sent a letter requesting the status of the application on April 5, 2002.[7] In a

letter dated April 18, 2002, the Tribe and the Gaming Commission sent the Union a letter

indicating that it had concerns about the application. It stated that it needed:

> "a list of the current organizational structure, noting any recent changes, the terms
> of the elected officials and background questionnaires filled out by the officers.
> The Gaming Commission noted there was no organizational chart provided on the
> original application, also Sherri Chiesa was listed as Western Regional Director
> and is also listed as Vice-President. Ms. Chiesa was one of the applicants that
> withdrew her application, however it is required as an Officer of the company. It
> was also noted the Vice-President listed for California was Jef Eatchel, who
> wasn't listed anywhere on the original application."[8]

The Union sent a response dated September 20, 2002, indicating that it had tried to comply with

the Barona Gaming Commission:

> ". . . even when that information did not appear to be material to any reasonable
> investigation (such as copies of 'state issued social security cards', when there are
> no such cards because only the federal government issues social security cards,
> and you already had copies of passports and state-issued drivers' licenses). There
> has been no progress in the granting of our applications, however, but rather what
> now seems clearly to be a pattern of delay and obstruction."

The Union then filed a grievance dated September 20, 2002 demanding invocation of

Section 13 to resolve the dispute concerning getting access to the facility. The Union

complained that the Tribe was violating Section 8(a) by failing to grant the Union access. The

Union stated that the Tribe was using the licensing process to deny access to the Union. The

Union stated, ". . . this grievance must be pursued to bring this interminable holding pattern to an

---

[6] Union Exhibits #11 and #12

[7] Union Exhibit #15

[8] Union Exhibit #16

Re: The Access Arbitration

end."[9]  The Tribe responded by letter dated October 9, 2002 in which its attorney, Mr. Bunce, explained to the Union that a Tribal Council Committee to hear the grievance would be established and that the rules of procedure would be made clear.[10]  A hearing was set for October 28, 2002 before a panel of three council members. The Tribe responded to the Union's appeal to the Tribal Council in a letter dated November 1, 2002 from Clifford LaChappa, the Chairman for the Barona Band if Mission Indians. The panel found that:

> ". . . the Hearing Committee finds that, even though there have been delays in the licensing process, those delays have been mutual and unintentional, and have not been unreasonable, discriminatory, or designed to impede access."

The decision goes on to note, "The Barona Gaming Commission applies this policy uniformly toward all organizations with on-site agents, whether they are vendors or not." After denying the Union's claim, the Commission goes on to note that the Gaming Commission needs two additional pieces of information; the background questionnaire for Ron Richardson and a complete organizational chart.[11]

The Union complied with the request for the additional information and forwarded to the Tribal Council on November 2, 2002. The Commission still had not made a decision on the licensing, which prompted a letter from the Union dated January 29, 2003 asking about the status of the application.[12]  Not receiving a response, the Union filed a demand for arbitration under Section 13(c) of the TLRO in a letter dated February 10, 2003. The Tribe responded, through its attorney Mr. Bunce, in a letter dated February 14, 2003 to the demand for arbitration. In this it noted that the Gaming Commission had sent the Union a letter December 12, 2002 seeking some

---

[9] Union Exhibit #18

[10] Union Exhibit #19

[11] Union Exhibit #21

[12] Union Exhibit #23

additional information. The additional information, after discussion with Mr. Bunce, apparently was supplied by the Union. At this point, Mr. Bunce was of the opinion that the license would be granted so he asked counsel for the Union whether he wished to proceed with the arbitration. Mr. Bunce quoted Mr. McCracken as stating, "You told me that you did wish to proceed, even if the arbitration was later rendered moot by the possible action of the Barona Gaming Commission to issue the desired licenses." Mr. Bunce reaffirmed the Union's demand to go forward with arbitration by quoting Mr. McCracken again having allegedly said, "You replied that you realized these costs, but still preferred to proceed with the arbitration."[13]  On February 20, 2003, the Gaming Commission was still seeking additional information, namely, the social security card for Ms. Chiesa. The Union provided that in a memo dated February 25, 2003.[14]

In a letter dated April 8th, the Union sent the Gaming Commission a letter asking whether the Union had been registered by the Commission or not. The Union also sought to find out, based on comments that it had heard, whether the Gaming Commission had licensed a competing labor organization to organize the employees at the Casino.[15]  In response, in a letter dated April 9, 2003, Mr. Bunce informed the Union that it could expect a decision from the Gaming Commission concerning the license at the end of April. He also informed the Union that the Gaming Commission would not reveal if any other labor organizations were licensed or not.[16]  In a letter dated February 24, 2003, which apparently was not mailed until April 25, 2003, the Gaming Commission informed the Union that it was granting a license. The letter asked for a meeting with the Union to discuss the terms and conditions of the license.[17]  The Union responded in the person of Sherri Chiesa, the Secretary Treasurer, informing the Commission

---

[13] Union Exhibit #26
[14] Union Exhibits #28 and #29
[15] Union Exhibit #31
[16] Union Exhibit #32
[17] Union Exhibit #33

that there was no need for a meeting; the Union simply needed to be directed to where it would obtain badges needed for access to the premises.[18] In a letter dated June 10, 2003 to counsel for the Union, Mr. Bunce informed Mr. McCracken that the Gaming Commission was waiting to provide a license to Union Representatives, Skurnik and Schneider. He also asked whether the Union wished to continue the arbitration on the licensing issue.[19] In a letter dated September 5, 2003 addressed to counsel for Union, Mr. Bunce again asked whether the Union was interested in organizing eligible employees because it had not heard from the Union Representatives to issue them licenses to go forward.[20]

In a letter dated September 26, 2003, counsel for the Union informed Mr. Bunce that Jennifer Skurnik and Danna Schneider had attempted to exercise their right under the Tribal Labor Relations Ordinance to speak to eligible employees at the Barona Casino. He noted that while the Representatives were allowed in the building and given courteous treatment, they were not allowed access prescribed by the TLRO. The Union noted that subsection 8(a) of the TLRO provides that "access shall be granted to the union for the purposes of organizing Eligible Employees, provided that such organizing activity . . . shall be done on non-work time in non-work areas that are designated as employee break rooms or locker rooms that are not open to the public." The Union asserted that the Representatives, under that Ordinance, were entitled to access the employee dining room for purposes of organizing eligible employees. Ms. Skurnik and Ms. Schnieder reported that they were confined to one table in the employee dining room, which contained approximately 50 tables. The Union stated that there is no support in the TLRO for this type of limitation. There is no additional qualification giving the Tribe the right to confine the Organizers to a particular place in such areas.

---

[18] Union Exhibit #34

[19] Union Exhibit #35

[20] Union Exhibit #36

The Union went on to state that its not obligated to explain why it wants broader access in the cafeteria, but in an effort to resolve the matter, it provided an explanation. The Union stated that its Organizers needed to be able to sit with employees while they ate their meals so they could communicate. Employees have a limited time for meals and find it difficult to sacrifice mealtime to listen to Union Organizers. This would occur, the Union stated, if the Union was limited to one table where employees had to go to the table in order to talk to the Union Organizers. The Union also stated that the table provided was right near the entrance and approximately 10 feet from an overhead camera. Mr. McCracken went on to state, "I had hoped that we would be able to vacate the arbitration hearing scheduled for November." He noted that it would only be possible to do so if the Union Organizers were given access allowed by the TLRO. In response to this, Mr. Bunce asserted that Mr. McCracken's factual description of the access is incomplete. He agreed that the two Organizers were given one table, but stated that it was not a table selected at random. It is the first table that any eligible employee encounters when entering the dining room. It is the most prominent location in the dining room. Under the TLRO, the Tribe noted, both the Union and the eligible employees have rights. Those employees have the right to refrain from organizing activities under Section 4, as well as engaging in them by talking with Organizers. According to the Tribe, "The Barona Band does not wish organizers to pester or otherwise inflict themselves on unwilling eligible employees. The choice to talk to organizers, or not, should be the employee's choice." Mr. Bunce noted that:

> "I must point out that your reference to taking up this issue at the upcoming arbitration hearing is entirely off-base. There is one and only one subject for the hearing of November 6, 2003: the delay in licensing issue which has already been through the first step of dispute resolution under the TLRO. The Barona Band will not participate in any attempt to expand the scope of that hearing to issues

Re: The Access Arbitration                                    Page 10

which have not even been raised other than through your letter, and have not been
through the first step of dispute resolution."[21]

## POSITION OF THE PARTIES

**UNION**

The Union recited in great detail the frustration it had experienced in attempting to obtain
access to the Casino. It explained, in detail, how it cooperated with the licensing process and
how at each step the Tribe thwarted the Union's efforts to become licensed. Ultimately, the
Tribe issued a license on April 25th, which it had backdated to February 25th. The Union pointed
out that the Tribe waited the maximum number of days possible before issuing the license. Then
when the Union attempted to access the facility with the license, the Tribe imposed additional
rules limiting the Organizers to one table in the cafeteria and sent a piece of literature to the
employees informing the employees the Union would be there, making it clear that the Union
Representatives were unwanted and would be confined to a little table in the dining room. All of
the Tribe's actions, the Union stated, were designed to prohibit the Union from having access as
provided in the TLRO. The Union stated that the Arbitrator should rule that the issue of access
is the issue before the Arbitrator and not, as the Employer stated, simply the issue of licensing.
To divide the question in this manner, the Union stated, would serve no purpose except to
provide further delay to the Union to effective access. The entire issue, the Union asserted, has
been access under Section 8(a). In addition to the fact that the parties' own correspondence
makes it clear that the issue all along has been access, another trip to the Tribal Council on the
question of the table in the corner would be futile. The rule was imposed by a team representing

---

[21] Union Exhibit #39

the Tribe, the Gaming Commission, and the Casino management.  There is no reason to think that any committee of the Tribal Council would rule otherwise.

On the merits, the Arbitrator should rule that the Union Organizers have access to the entire employee dining room.  There is nothing in the text of Section 8(a) suggesting that the Employer has any ability to impose limits on access, except to the extent of prohibiting interference with employees' work or with patronage of the Casino.  Because Section 8(a) does not give the Employer any power to restrict the movement of licensed representatives in the employee dining room it is really unnecessary to present any reason why such restrictions are not acceptable.  The Union asked that the Arbitrator hold that licensed Union Representatives may move freely throughout the Employer dining room to talk to employees as long as they do not interfere with any employees' work.  It requests that the Arbitrator not confine the ruling to the issue of the table in the corner.  If this is done, the Employer may then come up with a new set of restrictions that would then have to be litigated.  The Employer requested and was granted the opportunity to defer its cross-examination of Ms. Skurnik and to have a site visit by the Arbitrator in case the Arbitrator concludes that the question before him is access and not just the licensing process.  By the same token, the Union requested that if the Arbitrator decides the issue of the table in the corner should be taken up first by the Tribal Council, that the Arbitrator retain jurisdiction in the event either party is dissatisfied with the Tribal Council's decision.  The Union stated that the Tribe is not a particularly nefarious Employer, but is acting like most employers that oppose Union representation.  It is clearly not happy that the TLRO allows Union

Organizers access to its Casino. This is an obligation it has undertaken and the Arbitrator should hold the Tribe to it.

**TRIBE**

The Tribe argued that a demand for arbitration cannot cover events which have not yet occurred, especially in the context of a three-level process. Any demand for action at the second level must be limited to the subject of the first level. The Tribal remedy must first be exhausted under the express terms of the Ordinance. In this case, the wisdom of requiring the first level of dispute resolution at the Tribal level is clear. The Tribal Hearing Committee did afford the Union meaningful relief. It did order the Barona Gaming Commission to make a licensing decision within 60 days. Second, the demand for arbitration of February 10, 2003 refers to "a dispute under Section 8 of the TLRO." If the Union's claim were accepted, then the above six broad areas, each of which could easily be the subject of its own dispute resolution process, would effectively also bypass the first level of dispute resolution. Such a result is obviously not contemplated by the careful three-level process. The only issue before the Arbitrator should be that of licensing which has already been resolved by the Union receiving a license.

If the Arbitrator concludes that the proper scope of this arbitration is the issue regarding the delay in licensing, then this arbitration is moot. If the Arbitrator concludes that the proper scope of this arbitration includes both the delay in licensing and the table in the dining room, then the Tribe requests the Arbitrator to promptly reconvene the hearing to permit (1) cross-examination of Ms. Skurnik regarding the second issue; and (2) the introduction of the Tribe's own witnesses on the second issue. In addition, the Tribe requests that the Arbitrator conduct an

onsite visit to the employee dining room and the area in question in order to evaluate the reasonableness and effectiveness of the arrangements that the Tribe has made in the employee dining room for the representatives of the Union. With this additional evidence, the Arbitrator will be able to make a reasonable decision as to whether or not these arrangements comport with the requirements of the Ordinance.

## DISCUSSION

There are two facts which are abundantly clear based on the record before the Arbitrator. The first fact is that the Tribe has delayed the licensing of the Union in a deliberate and inappropriate manner. No matter how one looks at the process, as it is reflected in the documents in evidence, it is inconceivable that an investigation requesting access for organizing at a Casino can take almost four years to complete. There is no reasonable explanation for this delayed process other than the fact that the Tribe did not wish to grant access to the Union, as it is required to do so under the TLRO. To avoid having to comply with the TLRO, the Tribe, through the Gaming Commission, used tactics designed to delay the process and not to reach fruition in the form of a license. The concern described by the Gaming Commission that there may be criminal elements associated with the Union, citing the problems the dead Union President had at a different time in history is simply one example of the unfounded harassment that the Tribe engaged in to delay granting of a license.

The second issue, which is clear based on the evidence in the record, is the question the Union and the Tribe have been struggling with since 1999, is not licensing per se, but access to the facility. The Union sought a license simply because the Tribe required a license. What the Union actually sought and what the Tribe realized the Union was seeking was access to its

employees. The Tribe delayed granting the Union a license in order to delay granting the Union access. There has been no doubt since the beginning of this dispute that the issue is access and not a license. The license was simply a means to avoid granting access. For the Tribe to assert that the only issue properly before the Arbitrator is the issue concerning licensing is to ignore the facts on the record.

At no point was there any confusion that the Union wanted access. If the Tribe would have granted access without a license, the Union would have been perfectly satisfied. It was the Tribe that decided that access required a license and thereby went about delaying access through the licensing process. The Tribe ultimately granted access at the very last second, waiting the entire 60 days and then it backdated the license. The Tribe then threw another roadblock in the way of the Union by limiting the Union Organizers to one table in the cafeteria. While the Union objected to this, the Tribe asserted that the Union needed to go back through the entire grievance process in order to address this issue of access since, in the Tribe's opinion, the only issue of access before the Arbitrator was the issue of access concerning the licensing. The response, of course, is consistent with the Tribe's conduct in the licensing matter. To go back to the beginning would cause a further delay in obtaining access from one to two years based on the time it has taken the present dispute to reach the Arbitrator. It is entirely unreasonable to limit the issue, as the Tribe has requested. The issue was access from the beginning. The Tribal's action relative to limiting the Union's movement in the cafeteria is an issue of access and it needs to be addressed appropriately. If the Arbitrator were simply to address the issue as licensing, obviously, that question is at the present time moot. If the Arbitrator were to address the issue as the table in the cafeteria, that issue might resolve itself only to be followed by some other issue concerning Union access in a manner that limited the ability of the Union to access

the employees for organizing.  The question in dispute is what type of access the Union has to

the employees and what the Tribe can do to limit the Union's access.

Counsel for the Tribe refrained from cross-examining Union witness Jennifer Skurnik on

the basis that the only issue before the Arbitrator was the issue of licensing and not the broader

issue of access.  Counsel for the Tribe asked that if the Arbitrator decided that the issue was one

of access that the Tribe be permitted to cross-examine Ms. Skurnik and to present evidence on

the decision to limit access to one table in the cafeteria.  The Arbitrator indicated that he would

grant the Employer's request.  On this basis, the Arbitrator remands to the parties the issue of

Union access in its generic sense.  The issue is not limited to the table in the cafeteria, but is to

be inclusive of all access issues that in any way may limit the Union's free movement as

provided in the TLRO.  Any deviation imposed by the Tribe from the TLRO language found in

Section 8(a) is to be presented at this point.  The Tribe is put on notice that if it intends to move

from limiting the Union's access to one table in the cafeteria to some other limitation of a similar

nature, such as two tables in the cafeteria, those issues must be addressed at this point.  The

Union has waited since 1999 to obtain access as provided by the TLRO only to be denied by the

conduct of the Tribe and the Gaming Commission.  The Employer's opportunity to present

evidence on this question must be broad enough to address all questions of access and limitation.

In other words, the Arbitrator intends to issue a decision which will spell out the Union's access

rights in a manner that will preclude the addition of any further limitations inconsistent with the

language in Section 8(a).  Therefore, if the Tribe has other limitations that it is contemplating, it

must present those at this point.

The Arbitrator will reschedule the hearing at a time convenient for the parties and, during

the course of the resumed hearing, will take whatever evidence either the Tribe or the Union

wish to present concerning the general question of access.  The Employer will be allowed to

cross-examination Ms. Skurnik and present its own witnesses. In addition, if the Tribe wishes, the Arbitrator will view the employee cafeteria. The Arbitrator suggests that it might be possible to submit pictures or a videotape of the cafeteria in lieu of a visit in order to save time, but if the Tribe wishes, the Arbitrator will make a visit. It is the Arbitrator's intent that the matter be resolved by February 2004. Between the date of this decision and the end of February 2004, the Arbitrator expects to hold the hearing, view the cafeteria, entertain the argument of counsel, and issue a decision.

## AWARD

The issue before the Arbitrator is one of access by the Union to employees for purposes of organizing. It is not limited simply to the question of access involving the matter of licensing. Licensing is simply one of the access issues posed by the Tribe to delay the Union's receiving access to employees for organizing. Based on the Arbitrator's statement of the issue, the matter is remanded to the parties in a manner consistent with the Arbitrator's discussion above for the purpose of taking further evidence on the general question of access, including, but not limited to the table in the cafeteria at which the Tribe wishes to confine the Union. All issues of access will be heard and decided by the end of February 2004.

**IT IS SO ORDERED.**

Dated: December 2, 2003

Gerald R. McKay, Arbitrator

# TAB F

1 | Judge Raul A. Ramirez (Ret)
3600 American River Drive                        ORIGINAL
2 | Suite 145
Sacramento, California 95864
3 | (916) 488-4050
(916)488-3269
4

5

6 | **ARBITRATION**

7

8 | In the matter of the dispute between,    )
HOTEL EMPLOYEES and                      )
RESTAURANT EMPLOYEES                     )          **FINAL AWARD**
9 | INTERNATIONAL UNION                      )
AFL-CIO,                                  )
10 |                                           )
                Petitioner,                )
11 |                                           )
                                           )
12 | v.                                        )
                                           )
13 |                                           )
AGUA CALIENTE BAND OF                     )
14 | CAHUILLA INDIANS,                         )
                                           )
15 |                 Respondent.               )

16

17

18 |     The above-entitled matter came on for Binding Arbitration before the undersigned

19 | on February 11, 2004 at 10 AM. Kristin L. Martin, Esq. appeared as counsel for petitioner,

20 | Hotel Employees and Restaurant Employees International Union AFL-CIO, (hereinafter

21 | Union). Art Bunce, Esq. appeared as counsel for respondent, Agua Caliente Band of

22 | Cahuilla Indians, (hereinafter Tribe).

23 |     Having considered the respective arguments of counsel and having reviewed the

24 | evidence adduced at trial as well as the pre-trial briefs, background documents and

25 | supplemental materials supplied by the parties, the Arbitration renders the following binding

26 | decision: [1]

27 | _____

28 |     [1]As promised, the Arbitrator has attempted to be brief and issue a decision which
sets forth the rationale of the Arbitrator in the most simplistic terms.

**Exhibit F**

2428

1 **BACKGROUND:**

2       The Indian Gaming Regulation Act (IGRA) 25 U.S.C. §2701 et seq requires states

3 and tribes located within states where gaming is permitted to enter into a Tribal-State

4 Compact which will govern all gaming activities conducted by Indian tribes on Indian lands.

5       Pursuant to IGRA, the Tribe entered into a Tribal-State Compact with the State of

6 California wherein the Tribe agreed to provide "an agreement or other procedure

7 acceptable to the State for addressing organizational and representational rights of gaming

8 employees."

9       On October 11, 1999, the Tribe adopted the Tribal Labor Relations Ordinance

10 (hereinafter Ordinance) which gave gaming employees of tribal casinos the right to

11 organize, form a union and bargain collectively.  A review of pertinent sections of

12 the Ordinance will assist to clarify the issue now presented to the Arbitrator.

13       Section 8, entitled Access to Eligible Employees at subparagraph (a)

14 provides:

15       (a) Access shall be granted to the union for the purposes of
organizing Eligible Employees, provided that such organizing
16       activity shall not interfere with patronage of the casino or
related facility or with the normal work routine of the Eligible
17       Employees and shall be done on non-work time in non-work
areas that are designated as employee break rooms or locker
18       rooms that are not open to the public.  The tribe may require
the union and or union organizers to be subject to the same
19       licensing rules applied to individuals or entities with similar
levels of access to the casino or related facility, provided that
20       such licensing shall not be unreasonable, discriminatory, or
designed to impede access. (Emphasis added)
21
         Section 8, subparagraph (e) provides:
22
         (e) The tribe agrees to facilitate the dissemination of
23       information from the union to Eligible Employees at the tribal
casino by allowing posters, leaflets and other written materials
24       to be posted in non-public employee break areas where the
tribe already posts announcements pertaining to Eligible
25       Employees. Actual posting of such posters, notices, and other
materials, shall be by employees desiring to post such
26       materials. (Emphasis added)
27

28                         Page -2

1   Finally, Section 13 of the Ordinance provides a binding dispute resolution
2   mechanism whereby disputes of the present nature are decided pursuant to a three level
3   system of hearings.  Level one is directed to a "designated tribal forum" i.e. a Tribal
4   Council, Business Committee or Grievance Board.  Level two is directed to the "Tribal
5   Labor Panel" – a state-wide panel consisting of one or three Arbitrators[2].  A level three
6   hearing is relegated to confirmation of the Tribal Labor Panel's Arbitration Award.  A motion
7   to confirm may be directed to the appropriate Tribal Court or, if none, to the federal court
8   or state court if the federal court declines jurisdiction.  It is within this context of dispute
9   resolution procedure that the instant matter now comes before the Arbitrator for decision.
10  **FACTS:**
11      On August 1, 2003, five employees of the Agua Caliente Band's Spa Resort and
12  Casino requested permission from the Human Resources Manager to post union flyers in
13  non-public employee break areas of the workplace.

14      On August 15, 2003, the Tribe denied the request to post citing the registration
15  requirements of the Ordinance as well as Ordinance No. 29.[3]  In brief, the Tribe took the
16  position that Rule 1 of Ordinance No. 29 required that "In order to commence organizing
17  on the Reservation, an <u>Employee Organization</u> must first register with the Board."
18  (Emphasis added)

19      In response to the August 15, 2003 rejection, the Union initiated a complaint and
20  requested binding dispute resolution pursuant to section 13 of the Ordinance.  Pursuant
21  to that demand, the dispute has now gone to level one hearing where the panel found that
22  the Tribe did not violate the Ordinance, Ordinance No. 29, or the Rules and Regulations

23

24      [2]This Arbitrator is a member of the Tribal Labor Panel, a permanent panel of ten
        arbitrators whose function is to decide disputes such as the one presented herein.

25
26      [3]Ordinance No. 29 was enacted on May 16, 2000 for the purpose of adopting the
        aforementioned Tribal Labor Relations Ordinance.  Suffice it to say, nothing in
27      Ordinance No. 29 is meant to supersede or otherwise amend the written word of the
        original Ordinance.

28                          Page -3

1  promulgated under Ordinance No. 29.

2  **Issue:**

3        Whether the Tribe violated Section 8(e) of the Tribal Labor Relations Ordinance by

4        its reply letter of August 15, 2003.

5  **Discussion:**

6                                                        I

7        At the outset, the Arbitrator must determine the appropriate scope of review i.e.

8  whether the Arbitrator sits in a purely appellate position, (bound by the record

9  established at the level one hearing), or whether the Arbitrator may conduct a <u>de novo</u>

10 review of the evidence.[4]

11        The Arbitrator opts for the latter, not the former. Section 13 (c) of the Ordinance

12 specifically allows a member of the Tribal Labor Panel at level two proceeding to ..."hold

13 hearings, subpoena witnesses, take testimony and conduct all other activities needed to

14 fulfill its obligations under this Tribal Labor Relations Ordinance." Certainly the holding

15 of a hearing and the taking of testimony presupposes the ability to go beyond the

16 record established at the level one proceeding.

17        Finally, both the Union and Tribe have agreed to follow the American Arbitration

18 Association's protocol for labor dispute resolution (Section 13(c)(2).) Such protocol

19 contemplates a <u>de novo</u> review of the orderly presentation of testimony, evidence and

20 other relevant material to assist the Arbitrator in reaching a learned decision. Based on

21 the foregoing, the Arbitrator will decide the ultimate issue by way of <u>de novo</u> review of

22 all evidence timely submitted.

23

24

_____

25        [4]Although the parties originally stipulated that the Arbitrator must "base his
   decision on evidence presented in the first level of binding dispute resolution..."that
26 stipulation was quickly ignored when counsel for the Tribe requested and was granted
   permission to present witnesses and evidence on the issue of Union access. Based on
27 that ruling, the Arbitrator feels a need to clarify the issue.

28                                    **Page -4**

1

**II**

2       Although the Arbitrator has been presented with arguments stressing issues
3   dealing with free speech, security concerns, unfettered access to casinos, sovereignty
4   of Tribes, etc., the real issue presented for decision is the unambiguous meaning of the
5   provisions contained in Section 8(a) and (e) of the Tribal Labor Relations Ordinance. A
6   second review of those provisions will prove insightful.

7       Section 8(a) specifically refers to <u>access</u> "granted to the <u>union</u> for the purposes
8   of organizing Eligible Employees..." Subsection (a) concludes by making reference to
9   the ability of the Tribe to "require the <u>union</u> and or <u>union organizers</u> to be subject to the
10  same licensing rules..."

11      Section 8(e), on the other hand, does not refer to the activity defined as "access"
12  but instead makes reference to the dissemination of information by conduct otherwise
13  referred to as "posting...by <u>employees</u>." In fact, the term "access" is nowhere to be
14  found in Section 8(e).

15      When the two sections are read together in a common sense fashion and with
16  an eye towards implementing the written word of an agreement negotiated at arms
17  length by two sovereigns, namely, the Tribe and the State of California, the following is
18  apparent:

19              a). Section 8(a) applies to access by the union or union
20                      organizers;
21              b). Even Rule 1 of Ordinance No. 29 applies to an
                        employee organization;
22              c). Section 8(e) applies to posting by employees;

23      The Arbitrator finds that the mere posting of information by employees of the Tribe
24  does not run afoul of the licensing requirements of Section 8(a). Since the persons
25  seeking to post are already employed by the Tribe, the concerns dealing with security and
26  unfettered access to the casino are frivolous. Likewise, since it was the Tribe itself which
27

28                                       Page -5

1  negotiated the specific provisions of the Ordinance (a rule which differentiates between

2  access and posting on the one hand and union, union organizers, employee organizations

3  and eligible employees on the other), it cannot be said that the decision of the Arbitrator

4  somehow dilutes Tribal sovereignty.

5       Even assuming the issue of access versus posting was a close call, (which it is not)

6  the Arbitrator would find in favor of the Union on the basis that physical access is not an

7  issue; mere dissemination of information does not equate to actual organization; the Tribe

8  itself bargained the written word; the written word specifically set forth different criteria for

9  access and posting - an acknowledgment that one may require regulation while the other

10  does not.

11  **Award:**

12       For the reasons as set forth herein, the Arbitrator finds that Section 8(e) of the

13  Ordinance does <u>not</u> require licensure where Eligible Employees seek to post informational

14  materials dealing with union membership or the rights of employees to bargain collectively.

15       Furthermore, the Arbitrator finds that to ensure full and fair disclosure of the

16  findings, the Final Award shall be posted in all regularly used non-public employee break

17  areas where the Tribe already posts announcements pertaining to employees.  The

18  posting shall continue uninterrupted for a period of sixty days.

19

20

21  So Ordered

22  March 3, 2004

                               Judge Raul A. Ramirez (Ret.)

                               Arbitrator

23

24

25

26

27

28                                Page -6

# TAB G



**LITTLER MENDELSON**®

A PROFESSIONAL CORPORATION

FEB28 08 10:54AM

ALABAMA

ARIZONA

ARKANSAS

CALIFORNIA

COLORADO

CONNECTICUT

DISTRICT OF COLUMBIA

FLORIDA

GEORGIA

ILLINOIS

INDIANA

MASSACHUSETTS

MINNESOTA

MISSOURI

NEVADA

NEW JERSEY

NEW YORK

NORTH CAROLINA

OHIO

OREGON

PENNSYLVANIA

RHODE ISLAND

SOUTH CAROLINA

TEXAS

VIRGINIA

WASHINGTON

February 22, 2008

Theodore R. Scott
Direct: 619.515.1837
Direct Fax: 619.615.2261
tscott@littler.com

**VIA MAIL AND FACSIMILE**

Kristin L. Martin, Esq.
Davis, Cowell & Bowe, LLP
595 Market Street, Suite 1400
San Francisco, CA  94105

Re:    ***Petition to Confirm Cubias Arbitration Award***

Dear Ms. Martin:

This is in response to your February 5, 2008 correspondence.

It is unfortunate that you have chosen to question the accuracy of the statements in my February 1 letter. So be it. Pursuant to your request enclosed please find the following:

1.  Bylaws of Southern California Indian Law and Justice Center

2.  Intertribal Court of Southern California Governing Agreement

3.  Approval of the Governing Agreement referenced in Item 2

4.  Intertribal Court of Southern California Code of Civil Procedure and Rules of Court

5.  Resolution 11-03

I have no idea when these documents were created, but I suspect it was in or around the dates shown on the documents.

I am also enclosing an Application to Practice Law Before the Intertribal Court of Southern California and the referenced Rules for Admission to Practice Law Before the Intertribal Court of Southern California. If the Union wishes to pursue its petition to confirm the Cubias award, I suggest you apply for admission to practice before the Intertribal Court and then file your petition in that Court. I also again urge you to file a notice of dismissal of the petition filed with the United States District Court (Case No. 07 CV 2313 W (AJB)), as the District Court may not properly assert jurisdiction over the petition.

Exhibit G
Page 58

**Exhibit G**

Kristin L. Martin, Esq.
February 22, 2008
Page 2


This will also confirm that by providing these documents Pala is not conceding that it has any legal or contractual obligation to do so.


Very truly yours,

*Theodore R. Scott /ic*

Theodore R. Scott

TRS/rd
cc:    Pala Band of Mission Indians
Firmwide:84353877.1 055243.1007